UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HH-INDIANAPOLIS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:17-cv-00036-SEB-DML |
| | ) | |
| CONSOLIDATED CITY OF | ) | |
| INDIANAPOLIS / MARION COUNTY, | ) | |
| INDIANA, | ) | |
| METROPOLITAN BOARD OF ZONING | ) | |
| APPEALS OF MARION COUNTY, | ) | |
| DIVISION I, | ) | |
| DEPARTMENT OF BUSINESS AND | ) | |
| NEIGHBORHOOD SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER**

HH-Indianapolis ("HH") has plans to open a retail store ("the Store") at a location on the north side of Indianapolis it has leased for a ten-year period ("the Premises"). Under the local zoning ordinance ("the Ordinance"), the Premises is not zoned for an "adult entertainment business" as defined by the Ordinance. The Indianapolis Department of Business and Neighborhood Services (DBNS) determined that, based on its inventory as well as its intentions, the Store would qualify as an adult entertainment business. HH appealed that determination to the Marion County Board of Zoning Appeals (BZA), which affirmed the DBNS. No appeal of that decision was taken in Marion Superior Court.

HH brought this Section 1983 action against Indianapolis, the BZA, and the

DBNS (collectively, "the City") for violations of the First Amendment, the Equal

Protection Clause of the Fourteenth Amendment, and state administrative law. HH seeks

*inter alia* a preliminary injunction enjoining enforcement of the Ordinance against HH.

HH's motion for a preliminary injunction is now before the Court. For the below reasons,

the motion is denied.

## Background

HH "is a retailer that intends to operate a retail establishment at the Premises to

sell lingerie, gag-gifts, tiaras, sashes, marital aids,[1] souvenirs, cards, and a minimal

amount of 'adult' [i.e., relating to sex] instruments and written materials." Pl.'s Br. Supp.,

p. 4; *see also* Pl.'s Am. Compl. ¶ 56 ("instructional DVDs and literature, as well as

clothing, greeting cards, Halloween costumes, games, sashes, tiaras, key chains, buttons,

gag gifts, joke books, and bumper stickers."). HH's parent company ("HH-

Entertainment") oversees several such retail locations across the country. In part, their

business model is to avoid classification as adult businesses under local law by

appropriately structuring their inventory, store layout, and other facets of their business

plan so as to fall outside or beneath whatever thresholds trigger such classification.

The Ordinance establishes a category of "adult entertainment businesses." Rev.

Code of the Consol. City and Cnty. of Indianapolis and Marion [hereinafter "Code"], ch.

807. The Ordinance defines several types of adult entertainment businesses, Code § 807-

_____

[1] The meaning of "marital aids" in this context is much disputed. *See infra*.

106, including, as relevant here, "adult bookstore[s]," *id.* § 807-103, and "adult service establishment[s]." *Id.* § 807-112. An "adult bookstore" is an establishment having at least 25 percent of its retail floor space used for the display of, at least 25 percent of its inventory consisting of, or at least 25 percent of its weekly revenue derived from, "adult products." *Id.* § 807-103. An "adult service establishment" is an establishment "which provides a preponderance of services involving specified sexual activities or display of specified anatomical areas." *Id.* § 807-112. "Adult products," *id.* § 807-103, "specified sexual activities," *id.* § 807-116, "specified anatomical areas," *id.* § 807-115, and "services involving specified sexual activity or display of specified anatomical areas," *id.* § 740-202, are all further defined in the Ordinance; "preponderance" is not.

The Ordinance also establishes different types of zoning districts, including C-3, C-4, C-5, and C-7 districts. "The C-3 District is for the development of an extensive range of retail sales and personal, professional and business services required to meet the demands of a fully developed residential neighborhood, regardless of its size." *Id.* § 742-104(C). Adult entertainment businesses may not operate as of right in a C-3 district. *Id.* § 743-1. An adult entertainment business may operate in a C-3 district after obtaining a use variance from the BZA, *see* R. at 244, and may operate as of right in a C-4, C-5, or C-7 district. Code § 743-1.

The Premises is located in a C-3 district.[2] *See* Defs.' Br. Opp., p. 2 (area district map). It is just across the street from a large C-4 district and two smaller C-5 and C-7 districts. *Id.*

In summer 2016, HH selected the Premises as the site for the Store. HH communicated with a city planner for the City, who confirmed to HH the definition of "adult bookstore" under the Ordinance. In July 2016, HH entered into a ten-year lease for the Premises. HH then applied to DBNS for structural and sign permits in connection with the Premises. DBNS noted that the proposed signage advertised *inter alia* "erotica." *See* R. at 254. DBNS suspected that HH intended to operate an adult entertainment business and requested information from HH about the Store. In response, HH submitted information including a floor plan and inventory and revenue projections ("the Initial Submission"). DBNS found the information in the Initial Submission to be "imprecise and contradictory[.]" R. at 247. DBNS denied the requested permits after determining that HH intended to use the Premises as an adult service establishment without holding a use variance.

Without first seeking a use variance, HH appealed the determination of the DBNS to the BZA. At a December 6, 2016, hearing on that appeal, DBNS staff presented a report to the BZA summarizing its grounds for determining the Store to be an adult

---

[2] No matter the zoning district, adult entertainment businesses are not permitted to operate as of right within 500 feet of a dwelling district, and DBNS staff reported that the Premises is approximately 355 feet to the north of the nearest dwelling district. BZA Hr'g Tr. (Dkt. 12) 22. Thus, even if the Premises were located in a C-4 district, a use variance would still be required to operate an adult entertainment business there. *Id.*

service establishment or, in the alternative, an adult bookstore. DBNS again emphasized the vagueness and imprecision of the Initial Submission. Tr. 23. DBNS staff noted that, while HH reported an "adult [products] subtotal" of ca. 16 percent of inventory and 24 percent of sales, R. at 256, the "toys" category[3] constituted ca. 13 percent of inventory and 29 percent of sales—itself putting HH past the 25 percent threshold for adult bookstores. *Id.* DBNS staff noted further that, while the area set aside for "adult" products in HH's proposed floor plan included "sensual care" products, R. at 257, "sensual care" products were not included under HH's "adult [products] subtotal[,]" R. at 256, and it "seem[ed] likely that a significant portion, if not all, of the products within the 'sensual care' department would be classified as an adult product[,]" R. at 248, comprising ca. 12 percent of inventory and 14 percent of sales. R. at 256. Finally, DBNS staff noted that "marital aids" were not included in the "adult" product area by HH, but that "[m]arital aids, by definition, are sex toys." R. at 248.

DBNS staff concluded that, even if the Premises would not be used as an adult bookstore on the basis of the figures in the Initial Submission, when viewed critically, it would be used as an adult service establishment. This was so because HH proposed both "[t]he sale or display" of media "characterized by an emphasis" on specified sexual activities or specified anatomical areas in the form of adult literature and movies, and

---

[3] An "adult toys" category was separately reported, R. at 256, leaving DBNS and remonstrators to speculate as to what "toys" HH proposed to sell that were not "adult." As counsel for remonstrators argued, "This is not a Toys 'R' Us. They don't sell scooters, they don't sell . . . skateboards, basketballs or baseballs." Tr. 30. Counsel compared the ca. 30% figure for "toys" in the Initial Submission unfavorably to the ca. 6% figure for "games/party/toys" in the Later Submission. *Id.*; R. at 23 (Later Submission).

"[t]he presentation of" media "characterized by an emphasis" on specified sexual activities or specified anatomical areas in the form of workshops, courses, and product demonstrations as conducted at other HH-Entertainment stores. R. at 248–49. This combination would render the Store an adult service establishment under the Ordinance.[4] Alternatively, DBNS staff concluded that, "by partitioning off a specialty sales area" from the main retail area, *see* R. at 258–59, the partitioned area would constitute its own adult entertainment business. R. at 249.

Remonstrators—community members, nearby property owners and tenants, and a city-county councillor—appeared by counsel and submitted evidence. Counsel for remonstrators urged the same theory as the DBNS: that HH intended to use the premises for an adult service establishment by offering adult media for sale and by offering courses, workshops, and product demonstrations. Remonstrators submitted photographs showing the high, and highly visible, volume of adult products at other HH-Entertainment stores, R. at 313–16, and the nature of the courses, workshops, and "live demo[nstration]s of our steamiest couples' products . . . hosted at all [HH-Entertainment] retail locations[.]" R. at 324; *see, e.g.,* R. at 325–27. Remonstrators concluded that by "sell[ing] and display[ing]" adult media, "offer[ing] classes to the public . . . utiliz[ing]"

---

[4] "Live performances by topless . . . dancers . . . or similar entertainers" may also give rise to an adult service establishment in combination with another covered service, Code § 740-202(4), but the DBNS apparently did not so categorize the live demonstrations conducted at other HH-Entertainment stores. Remonstrators did rely on this subsection in their presentation, however. R. at 323.

adult media, and "offer[ing] classes to the public . . . includ[ing] live demonstrations and performances . . . ," HH would operate an adult service establishment. R. at 330.

The city-county councillor present at the hearing accused HH-Entertainment of having "a track record of deception in trying to hide [its] true intentions when it seeks to establish" its retail stores, and asked the BZA to "use a healthy, you know, attitude of skepticism" in evaluating HH's presentation. Tr. 19. The councillor reported that, when HH-Entertainment attempted to open a store in Lexington, Kentucky, "the permits . . . applied for indicated they were building a coffee shop." Tr. 20. The councillor further agreed with the DBNS's suggestion that the Initial Submission was "decept[ive] in the ways [HH] describe[d] its products." *Id.*

HH presented additional evidence on the Store at the BZA hearing, including revised inventory and revenue projections ("the Later Submission"). HH claimed that the Initial Submission inaccurately relied on figures from HH-Entertainment stores nationwide and from HH-Entertainment's on-line store. The Later Submission projected figures specific to the Store, R. at 23, but DBNS opined that the Later Submission was vitiated by a similar vagueness of categorization as beset the Initial Submission and appeared to contradict it. HH repeatedly disclaimed any intent to operate the Store as an adult service establishment or an adult bookstore. Specifically, HH insisted that, when it proposed to sell "marital aids," it meant condoms, not sex toys, Tr. 5, and that it had no intention of offering courses, workshops, or product demonstrations at the Premises, as other HH-Entertainment stores do. Finally, HH invited the BZA to tour the Store once it

was stocked and set up so that BZA members could see for themselves what sort of business HH proposed to operate.

At the conclusion of the December 6, 2016, hearing, the BZA voted unanimously (5-0) to affirm the DBNS's determination that HH proposed to operate an adult entertainment business, which violated the zoning code for that location. Tr. 35. HH filed this lawsuit less than a month later on January 5, 2017, Dkt. 1, and an amended complaint on January 12, 2017. Dkt. 9. Its motion for a preliminary injunction was filed on June 2, 2017, Dkt. 33, on which this Court held a hearing on September 13, 2017. Dkt. 46.

## Standard of Decision

"An equitable, interlocutory form of relief, a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc. v. Girls Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (quotations and citation omitted). A movant seeking a preliminary injunction must show that (1) it is reasonably likely to succeed on the merits, (2) it is suffering irreparable harm without adequate remedy at law, (3) the balance of harms weighs in its favor, and (4) the injunction is in the public interest. *Christ. Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). The movant's burden is by a preponderance of the evidence. *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1024 (S.D. Ind. 2014).

The analysis proceeds in two steps. *Girl Scouts*, 549 F.3d at 1086. At the threshold, a court must determine whether there is a "better than negligible" chance of success on the merits, *id.* at 1096, and whether the alleged harm is irreparable without

adequate legal remedy. *Id.* at 1086. If the movant cannot pass the threshold, its motion must be denied. *Id.*

But if the movant passes the threshold, then a court must proceed to balance the harm to the movant unless the injunction issues against the harm to the nonmovant if it does. *Id.* The balance is struck on a sliding scale: the greater the movant's likelihood of success, the less favorable the balance of harms need be; the lesser the movant's likelihood of success, the more favorable the balance need be. *Id.* "Where appropriate," the court must also weigh any burden or benefit to any third party, or the "public interest," if or unless the injunction issues. *Id.*

## Analysis

HH presses its challenge to the City's determination under the Ordinance from a number of angles. Under the First Amendment, HH raises (I.A) an "as applied" challenge to the Ordinance as applied through the City's determination that HH is an adult entertainment business, (I.B) a facial challenge to the definition of "adult service establishment" for vagueness, and (I.C) a facial challenge to the definition of "adult service establishment" for overbreadth. Under the Fourteenth Amendment, HH raises (II) an equal protection claim. Finally, under Indiana administrative law, HH raises (III) a challenge to the City's decision as arbitrary, capricious, and unsupported by substantial evidence.

After careful review, we conclude that none of the constitutional claims have a better than negligible chance of success on the merits, and the state-law claim does not

allege irreparable injury. HH's petition therefore fails to make it across the threshold of the preliminary injunction standard.

## I. First Amendment Claims

The threshold question in any free-speech case is the existence of some protected speech or expression. *See Green Valley Invests. v. Winnebago County*, 794 F.3d 864, 867 (7th Cir. 2015); *Ind. Vol. Firemen's Ass'n, Inc. v. Pearson*, 700 F. Supp. 421, 437 (S.D. Ind. 1988). At the Premises, HH proposes to sell "instructional DVDs and literature," "greeting cards," "joke books," "bumper stickers," and material relating to "the emerging bondage-domination-sadomasochism ('BDSM') political and cultural movement[.]" Pl.'s Am. Compl. ¶ 56. Such nonobscene material, even if indecent or pornographic, is expression protected by the First Amendment. *See, e.g., New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556, 558 (7th Cir. 2009).

"The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest." *Christ. Legal Soc'y*, 453 F.3d at 859 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, on a motion for a preliminary injunction under the First Amendment, "the likelihood of success on the merits will often be the determinative factor." *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004). We therefore proceed to consider the merits of each of HH's First Amendment claims.

### A. "As Applied" Challenge

In brief, HH's "as applied" claim comes down to this: HH told the City it did not propose to operate an adult entertainment business; the City did not believe HH; the City determined that HH did propose to operate an adult entertainment business; the City therefore required HH to operate as of right in a C-4, C-5, or C-7 zoning district, rather than a C-3 district; HH claims the City's determination was erroneous according to the state-law definition of "adult entertainment business." These facts are unlikely to make out a constitutional violation. Accepting HH's contrary position would constitutionalize every mine-run state-law commercial zoning dispute so long as the applicant proposed to sell books. This we decline to do.

The constitutionality of municipal land-use regulation of sexually indecent expression is controlled by the Supreme Court's decisions in *Young v. American Mini Theaters, Inc.*, 427 U.S. 50 (1976), *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), and *City of Los Angeles v. Alameda Book, Inc.*, 535 U.S. 425 (2002). Under those cases, "state and local governments may regulate adult establishments by using time, place, and manner restrictions to reduce the secondary effects of those businesses on third parties, but may not regulate them to restrict the dissemination of speech disapproved by local residents." *Annex Books, Inc. v. City of Indianapolis*, 740 F.3d 1136, 1137 (7th Cir. 2014). In this context,

> time, place or manner restrictions can be upheld as content-neutral restrictions on adult entertainment if they (1) are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant government interest in curbing adverse secondary effects; and (3) still leave open ample alternative channels for communication.

*Schultz v. City of Cumberland*, 228 F.3d 831, 845 (7th Cir. 2000).

While "the mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating" such requirements as impermissible prior restraints on expression, *Young*, 427 U.S. at 62, municipal zoning, licensing, and permitting schemes—particularly in combination—can operate as impermissible prior restraints in particular cases. *Green Valley*, 794 F.3d at 868. But different municipal acts exact different First Amendment costs and are to be distinguished on that basis. Censorship schemes present the greatest threat to the First Amendment, *see Freedman v. Maryland*, 380 U.S. 51, 57–58 (1965), followed by permitting and licensing, followed by zoning. *See City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 782–83 (2004) (distinguishing "typical First Amendment harm[s]" of different regulatory measures); *id.* at 787 (Souter, Kennedy, JJ., concurring in part and in the judgment) ("[A]lthough Littleton's [licensing] ordinance is not as suspect as censorship, neither is it as innocuous as common zoning.").

"A zoning measure can be consistent with the First Amendment if it is likely to cause a significant decrease in secondary effects and a trivial decrease in the quantity of speech." *Alameda Books*, 535 U.S. at 445 (Kennedy, J., concurring in the judgment).[5] "If a city can decrease the crime and blight associated with certain speech by the traditional exercise of its zoning power, and at the same time leave the quantity and accessibility of

---

[5] "*Alameda Books* was decided by a plurality plus Justice Kennedy; [the Seventh Circuit has] treated Justice Kennedy's concurrence, the narrower opinion, as the holding of the case." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th 2015).

the speech substantially undiminished, there is no First Amendment objection." *Id.*; *see also Z.J. Gifts*, 541 U.S. at 783 ("Nor should zoning requirements suppress [protected adult] material, for a constitutional zoning system seeks to determine *where*, not *whether*, [such] material can be sold." (original emphasis)).

Where, for example, a city "has not prohibited the plaintiff from operating a burlesque theater," but "has merely prohibited the operation of such a theater in proximity to a residential neighborhood[,]" and the city "is a large city" with "abundant convenient locations in which the operation of such a theater would not violate" the city's zoning ordinance, "[i]n these circumstances, . . . the impairment of First Amendment values is slight to the point of being risible," since no expression is "suppressed but [is] merely shoved off to another part of town, where it remains easily accessible to anyone to wants to patronize that kind of establishment." *Blue Canary Corp. v. City of Milwaukee*, 270 F.3d 1156, 1157 (7th Cir. 2001) (quotations and citation omitted).

Here, HH's first claim under the First Amendment is styled an "as applied" challenge to the Ordinance, Pl.'s Br. Supp., p. 12, but this is a mischaracterization. HH does not challenge the Ordinance at all. HH nowhere contests that, if the Store was in fact an adult entertainment business under the Ordinance, and the City was correct in so determining, then the City could regulate HH's expression under the Ordinance as a valid time, place, and manner restriction conformable to the First Amendment. Rather, HH's claim is essentially that, by determining the Store to be an adult entertainment business, the City got the Ordinance wrong as a matter of state law, and so wrong that that the only explanation for the error is censorial motive. Pl.'s Br. Supp., p. 11; Defs.' Br. Opp., p. 11.

The question presented by HH's first claim is not, therefore, whether the Ordinance abridged HH's First Amendment rights, but whether the City's erroneous application of the Ordinance abridged HH's First Amendment rights.

It is unlikely to have done so. "[T]he state must be tested by its operation and effect." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 708 (1931). The operation and effect of the state action in this case has been, not to prohibit HH from operating its business, but to prohibit its operation in a C-3 zoning district. HH's expression has not been suppressed; HH has merely been asked to move its business across the street, where C-4, C-5, and C-7 districts lay open to it as of right.[6] In other words, the City's application of the Ordinance to HH, erroneous or not, was done under "the traditional exercise of its zoning power, and at the same time [has left] the quantity and accessibility of ['adult' expression] substantially undiminished[.]" *Alameda Books*, 535 U.S. at 445. Thus it is likely that there simply "is no First Amendment objection." *Id.*

As noted above, there would apparently be no objection from HH at all if HH were of the view that the City correctly determined HH's proposed business to be an adult entertainment business. HH's claim hinges entirely on its contention that the City

_____

[6] HH's ten-year lease for the Premises no doubt makes relocating financially undesirable, but HH's finances are not an object of the First Amendment's solicitude. *Renton*, 475 U.S. at 54 (giving no weight to contentions that "practically none" of city land zoned for adult business commercially available for sale or lease, and that no "commercially viable" sites existed) ("That [adult businesses] must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. And although we have cautioned against the enactment of zoning regulations that have 'the effect of suppressing, or greatly restricting access to, lawful speech,' we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices." (citation omitted)).

erroneously determined the Store to be an adult entertainment business, motivated by its disapproval of HH's speech and intending to suppress it. But HH has not persuaded us that mere subjective censorial intent on the part of final municipal decision-makers, assuming that was the case, can convert an otherwise constitutional regulation of expression into an unconstitutional one.

HH cites *Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011) (on appeal from denial of qualified immunity), for the proposition that "a First Amendment as-applied claim lies when there is an application of an otherwise neutral ordinance to squelch unwanted speech." Pl.'s Suppl. Br. (Dkt. 47), p. 2. That is true where, as in *Surita*, application of a rule produces unconstitutional effects. It has no or limited relevance where, as here, the effect produced (i.e., requiring HH to relocate to a nearby, readily available C-4, C-5, or C-7 zoning district) would not in itself be challenged as unconstitutional, if produced by a correct application of the constitutionally unchallenged Ordinance. Here, rather, it is not the effect produced, but the subjective censorial intent of those producing it, that is alleged as the sole ground of unconstitutionality.

In *Surita*, as relevant here, plaintiff was politically opposed to a municipal towing ordinance. 665 F.3d at 865. Plaintiff intended to hold a rally in opposition to the towing ordinance, *id.* at 866, for which the city, under its ordinance governing public assemblies, charged her a fee of $1,500 based on the number of police officers required to patrol the event. *Id.* at 867. Plaintiff alleged that the city police chief "(1) violated her First Amendment rights by applying the Assembly Ordinance to her in a discriminatory

manner; (2) retaliated against her for exercising First Amendment rights; and (3) attempted to chill her future exercise of First Amendment rights." *Id.* at 874.

As to the first claim, the court found that application of the assembly ordinance to plaintiff impermissibly "impose[d] financial burdens on [a] speaker[] based on the content of [her] speech" by "vary[ing] the fee according to the estimated cost of maintaining public order." *Id.* at 876–77. That effect was impermissible no matter whether correct as a matter of state law and no matter the police chief's subjective intent. *See id.* As to the second and third claims, the court noted that "[r]etaliation claims and chilling claims are related in that the Constitution protects citizens from penalties that follow protected speech (retaliation) and threats of penalties for future protected speech (chilling)." *Id.* at 877. Such claims lie because it is impermissible to take or threaten any act, no matter whether authorized by state law, solely to punish a speaker for her protected speech. *See id.*

Though HH does not style it as such, HH's "as applied" claim might be better thought of as a chilling claim. So too might one of the cases on which it heavily relies, *E-Bru, Inc. v. Graves*, 566 F. Supp. 1476 (D.N.J. 1983).[7] In any event, a chilling claim

_____

[7] In *E-Bru*, the correctness of the application to plaintiff of a zoning ordinance requiring a certain number of off-street parking spaces was unchallenged; "the only issue" was whether the ordinance, never before enforced against any business in the zoning district, had been selectively applied against plaintiff to suppress its protected expression. 566 F. Supp. at 1480. The court concluded that it was likely "that the ordinance was enforced against plaintiff only to inhibit its exercise of first amendment freedoms." *Id.* at 1479. But even in *E-Bru*, the court found the state action to be constitutionally impermissible, not merely because of the municipality's censorial intent, but its *effect* was "through indirection to prohibit" adult bookstores entirely, rather than merely "to restrict or control" them, a "blanket prohibition" "[n]ever upheld" by any case. *Id.* at 1480. This case, by contrast, is entirely about the City's efforts to restrict or control adult entertainment businesses under *Renton et al.*

would end up where it started: asking whether state law justified the City's determination that HH proposed to operate an adult entertainment business, i.e., whether "the [alleged] harm would have occurred anyway." *Surita*, 665 F.3d at 874. Moreover, a chilling claim could not furnish grounds for the injunction sought here in the absence of any evidence or argument that being channeled from a C-3 district to a C-4, C-5, or C-7 district was "adverse conduct" or a "deprivation" such as would "deter a person of ordinary firmness from exercising" First Amendment rights. *Olendzki v. Rossi*, 838 F. Supp. 2d 771, 783 (C.D. Ill. 2012) (quotations and citation omitted). Finally, we note that, other than the alleged error itself, HH has not adduced any evidence that the City's final decision-makers had a censorial or discriminatory motive or intent here.[8]

In sum, if there has been any cognizable infringement of HH's First Amendment interests here, the infringement was "slight . . . ." *Blue Canary Corp.*, 270 F.3d at 1157. And whatever First Amendment interests are infringed by an erroneous zoning

---

[8] HH points several times to the statement of a "city official" that, "even though legally the store is not violating any code," the Store should be prohibited at the Premises because it "is not the kind of business we want." *See, e.g.,* Pl.'s Am. Compl. ¶ 61. HH's cited source for this statement reveals that it is a conflation of two different statements, one of Jonathan Eriksen, director of the Greater Allisonville Community Council ("This is not the kind of business we want added to the list of new residents in the area."), and one of City-County Councillor Christine Scales ("Technically they're going to meet the codes to put their business here, but at what point does a community have a voice in saying: 'No, we live here, we shop here, we work here, we invest here and we don't want this here.'"). RTV6, *Uproar Over Adult Store Opening Next to Chuck E. Cheese in Castleton*, WIBC (Sept. 8, 2016), http://www.wibc.com/news/local-news/uproar-over-adult-store-opening-next-chuck-e-cheese-castleton (last visited Sept. 11, 2017). It is true that the administrative record discloses intense community opposition to HH operating at the Premises, frequently in content-based terms, *see* R. at 49–243, but HH has mustered no evidence to show that similar considerations affected the judgment of the DBNS or BZA.

classification under an otherwise constitutional zoning scheme are adequately protected by the prompt judicial review available in state court.

Though justified as content-neutral time, place, and manner restrictions aimed at the secondary effects of protected expression, not at suppressing the expression itself, *Renton*, 475 U.S. at 46–49, adult-business zoning, licensing, and permitting schemes are to some degree content based because they only apply to purveyors of adult content. *Alameda Books*, 535 U.S. at 448 (Kennedy, J., concurring in the judgment) ("These ordinances are content based, and we should call them so."); *BBL*, 809 F.3d at 325 ("The 'content-neutral' label in this context is a misnomer[.]"). Thus, even if justified as content-neutral time, place, and manner restrictions, we stress that such schemes can still raise "the dangers of a censorship system" by operating as prior restraints, *Green Valley*, 794 F.3d at 868 (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)), and must therefore operate subject to "adequate procedural safeguards" designed to obviate such dangers. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990) (plur.) (citing *Freedman*, 380 U.S. 51; *Se. Promotions*, 420 U.S. at 562).

First, "a scheme that places 'unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.'" *FW/PBS*, 493 U.S. at 225–26 (plur.) (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988)). Such standardless discretion is therefore "not [to] be tolerated . . . ." *Id.* at 225. This is so in part because, in the licensing context and *mutatis mutandis* the zoning context, "the absence of express standards makes it difficult to distinguish . . . between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial

power." *Lakewood*, 486 U.S. at 758. Express discretion-constraining standards, by contrast, "check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech." *Id.*

Second, "there must be the possibility of prompt judicial review in the event that the license is erroneously denied." *FW/PBS*, 493 U.S. at 228 (plur.). In the context of licensing, permitting, and zoning schemes short of censorship, the "ordinary judicial review procedures" of state courts will adequately protect against the possible First Amendment harms occasioned by erroneous determinations. *Z.J. Gifts*, 541 U.S. at 781. If those procedures prove inadequately sensitive to First Amendment concerns, or outright hostile to them, "federal remedies would provide an additional safety valve." *Id.* at 782 (citing 42 U.S.C. § 1983).

Here, therefore, if HH is correct that the City's determination that HH proposed to operate an adult entertainment business was so lacking in state-law justification that it can be explained only as an "illegitimate abuse of censorial power[,]" *Lakewood*, 486 U.S. at 758, then the state courts will easily ferret out that state-law error. But if the City's application of the Ordinance was not so lacking in state-law justification as to even constitute reversible error in state court, then HH's First Amendment claim evaporates, as noted above. "[F]ederal courts, as [the Seventh Circuit has] explained time and again, are not zoning boards of appeal."[9] *CEnergy-Glenmore Wind Farm No. 1, LLC v. Town of*

---

[9] HH relies on two idiosyncratic district court cases which, in our view, run directly counter to this admonition. *Lovers Lane & Co. v. Village of Libertyville*, 128 F. Supp. 2d 1126 (N.D. Ill. 2000); *Santa Fe Springs Realty Corp. v. City of Westminster*, 906 F. Supp. 1341 (C.D. Cal. 1995). There, the district court simply engaged in a free-floating inquiry as to whether a state-

*Glenmore*, 769 F.3d 485, 487 (2014) (citing cases). Without any demonstrated need for

the "additional [federal] safety valve[,]" *Z.J. Gifts*, 541 U.S. at 782, the Supreme Court

has deemed state-court civil procedure, in the ordinary case, sufficiently protective of

whatever First Amendment interests may be at stake in an erroneous zoning classification

under an otherwise constitutional zoning ordinance.

    HH advances three arguments in support of its position, but none are persuasive.

First, HH argues that the City impermissibly considered the conduct of other retail stores

under the HH-Entertainment umbrella. Pl.'s Br. Supp., p. 13; Pl.'s Reply Br., pp. 2–5.

Whether such evidence was relevant, *see* Pl.'s Reply Br., p. 4 (citing cases applying

---

law regulatory determination had been made erroneously. In neither case did the court identify a
basis in First Amendment doctrine for such inquiry. *See Lovers Lane*, 128 F. Supp. 2d at 1127–
28 ("[T]he Court reserves consideration of the constitutional challenges of the plaintiff as may be
necessary. The issue is properly resolved by construing the ordinance narrowly . . . ."); *Santa Fe*,
906 F. Supp. at 1355 (reciting general standards for valid secondary-effects regulation under
*Renton*; citing *Southeastern Promotions* generally for proposition that First Amendment rights
are abridged by denial of permit "without a legitimate reason[,]" where *Southeastern
Promotions*, discussed above, considered whether permit denial without adequate procedural
safeguards to obviate dangers of censorship system was impermissible prior restraint). In both
cases, the district court found state-law error, and found such error to be conclusive of an
unconstitutional intent to suppress protected but unpopular speech. *Lovers Lane*, 128 F. Supp. 2d
at 1130 ("Plaintiff's proposed business is therefore a permitted use in the [zoning district] . . . [;]
[t]he Zoning Certificate is necessary for the plaintiff to exercise its right to conduct its proposed
business at the proposed location . . . ."); *Santa Fe*, 906 F. Supp. at 1362 ("Based upon the
foregoing, the Court concludes that the City Council abused its discretion by denying the
plaintiff's [conditional use permit] application. The Court finds that the City Council applied
improper criteria and articulated pretextual reasons when it denied the [conditional use permit]
application. . . . Because all of the conditions necessary for the issuance of a [conditional use
permit] have been satisfied in this case, the Court hereby ORDERS that a permanent injunction
shall issue requiring the City to issue a [conditional use permit] to the plaintiff.").
    With due regard for the courts' decisions in those cases, we decline to follow them. Their
inquiries have not been sanctioned by any court of appeals, and run contrary to the Seventh
Circuit's admonition to federal courts not to sit as boards of zoning appeal. Indeed, *Santa Fe*
expressly applied an appellate standard of review to the decision of a body over which it did not
sit in judgment. 906 F. Supp. at 1362 (purporting to review municipal decision for abuse of
discretion).

Federal Rules of Evidence), is a matter of Indiana evidentiary law. HH points to no rule

of constitutional law barring the City from considering whether other HH-Entertainment

stores would be adult entertainment businesses under the Ordinance in determining

whether HH would operate the Store as an adult entertainment business.[10] Similarly, we

agree with the City that HH's recitation of Indiana's unwillingness "to disregard

corporate identity[,]" Pl.'s Reply Br., p. 2 (quoting *Extra Energy Coal Co. v. Diamond

Energy and Res., Inc.*, 467 N.E.2d 439, 441 (Ind. Ct. App. 1984)), "lacks constitutional

significance[.]" Defs.' Br. Opp., p. 12.

---

[10] HH cites *Fernandes v. Limmer*, 663 F.2d 619 (5th Cir. 1981), for the proposition that "the denial of a permit based on prior misconduct constitutes a[n impermissible] prior restraint[.]" Pl.'s Reply Br., p. 15. Setting aside the distinction between permits and zoning classifications, *but see Z.J. Gifts*, 541 U.S. at 783, "[i]n the successful facial challenge in *Limmer*, the impermissible prior restraint was effectuated because *under no circumstances* could an applicant purge the taint of a previous violation [of the terms and provisions of any prior permit issued by the Dallas airport to engage in protected expression there]." *Rosenbaum v. City of San Francisco*, 484 F.3d 1142, 1166 (9th Cir. 2007) (original emphasis). Such a categorical debarment from a public forum stands "[i]n sharp contrast" to a municipal act which considers past misconduct merely as evidence, while affording applicants opportunities to redeem such misconduct. *Id. Limmer* therefore says very little about a municipal zoning board's constitutional obligations when weighing competing evidence in making a zoning classification after a contested hearing.

HH next cites *Robb v. Hungerbeeler*, 281 F. Supp. 2d 989 (E.D. Mo. 2003), as holding that it was "mere pretext for invidious viewpoint discrimination" for the state highway commission to deny a branch of the Ku Klux Klan participation in the state's adopt-a-highway program "because courts had recognized the violent nature" of the Klan's other branches "elsewhere in the country . . . ." Pl.'s Reply Br., p. 15. *Robb* held no such thing. Rather, in *Robb*, the commission defined eligible highway adopters by regulation as a person "for whom . . . courts have not taken judicial notice of a history of violence." 281 F. Supp. 2d at 998. The commission's stated reason for adopting this regulation was a concern that "allowing the Klan to participate . . . could make [the commission] liable to others . . . for dangerous conditions on the highway" because of the Klan's anticipated "response to taunts, jeers, or insults hurled at the group by those who do not agree with its position." *Id.* at 1001. The court rejected the commission's reasoning as an unreasonable restriction of access to a nonpublic forum because it effectively gave passing motorists a heckler's veto over the Klan's First Amendment rights. *Id.* at 1002. Like *Limmer*, *Robb* says very little about what constitutional constraints are imposed on a zoning board's reception of evidence in making a zoning classification.

HH's second and third arguments cast the Ordinance as a prior restraint, to the extent that the City "can be viewed as banning [HH's] future speech based on past conduct," Pl.'s Br. Supp., p. 14, that "a municipal government cannot ban speech on the possibility that it *might* be obscene." *Id.* (original emphasis). These arguments miss the mark. It is inarguable that zoning, licensing, and permitting schemes, alone or in combination, may operate as impermissible prior restraints in particular cases. *Green Valley*, 794 F.3d at 868. The question is not whether a particular regulatory scheme can be characterized as a prior restraint, but whether this supplies "sufficient reason for invalidating" it. *Young*, 427 U.S. at 62.

HH points to features common to all or most zoning schemes: the zoning determination is made before activity at the site commences. *See id.* ("It is true . . . that adult films may only be exhibited commercially in licensed theaters. But that is also true of all motion pictures. . . . The mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances."). One need not allow a pig to foul the parlor before determining it belongs in the barnyard. *See Alameda Books*, 535 U.S. at 446 (Kennedy, J., concurring in the judgment) (quoting *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388 (1926) ("A nuisance may be merely a right thing in the wrong place, like a pig in the parlor instead of the barnyard.")).

HH's arguments in the end come down to a conviction that the City was required to believe HH when it assured the City that it did not intend to operate an adult entertainment business. This is simply not so. The BZA sits to hear and weigh evidence,

particularly the credibility of witnesses. *See, e.g., Burcham v. Bd. of Zoning Appeals*, 883

N.E.2d 204, 213 (Ind. Ct. App. 2008). HH's Initial Submission and its Later Submission

conflicted; the BZA was not required to credit the Later Submission and discredit the

Initial Submission simply because HH told it to. Nor was the BZA required to credit

HH's definition of "marital aids" and discredit the dictionary's or another source's. This

is particularly so where the BZA heard evidence that HH-Entertainment stores are not

credible witnesses before municipal planners as to their own business plans. Whether the

City's ultimate judgment was founded on a sufficient evidentiary and legal basis is not a

matter as would justify the issuance of a preliminary injunction from this Court under the

First Amendment.

### B.  Facial Challenge for Vagueness

HH challenges the Ordinance's definition of "adult service establishment" as

unconstitutionally vague. Specifically, as defined by the Ordinance, an adult service

establishment is "any building, premises, structure or other facility, or any part thereof,

under common ownership or control which provides a *preponderance* of services

involving specified sexual activities or display of specified anatomical areas." Code §

807-112 (emphasis added). HH contends that "preponderance" is unconstitutionally

vague. This is unlikely to be correct.

> [T]he void-for-vagueness doctrine protects against the ills of
> a law that "fails to provide a person of ordinary intelligence
> fair notice of what is prohibited, or is so standardless that it
> authorizes or encourages seriously discriminatory
> enforcement." The "vagueness doctrine addresses at least two
> connected but discrete due process concerns: first, that
> regulated parties should know what is required of them so

they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." In cases where the "statute abuts upon sensitive areas of basic First Amendment freedoms," "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." Even under the heightened standard for the First Amendment, though, the potential chilling effect on protected expression must be both "real and substantial" to invalidate a statute as void for vagueness in a facial challenge.

*Ctr. for Individ. Freedom v. Madigan*, 697 F.3d 464, 478–79 (7th Cir. 2012) (citations omitted). To be void for vagueness, a law must be vague, "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Smith v. Goguen*, 415 U.S. 566, 578 (1974).

A person of ordinary intelligence would not have difficulty understanding what conduct comes within the Ordinance. Indeed, the Ordinance does not even establish "an imprecise but comprehensible *normative* standard," *id.* (emphasis added), but rather a concrete physical standard. "Preponderance" means "1. a superiority in weight"; "2. a superiority in power, influence, importance, or strength"; "3a. *a superiority or excess in number or quantity*"; or "[3]b. *majority*[.]" *Webster's Third New International Dictionary* 1791 (1993) (emphasis added). An ordinary reasonable person would understand that a "preponderance" of a thing means a "majority" of that thing or more of that thing than any other thing.

Specifically, the Ordinance gives fair notice to a person of ordinary intelligence that an adult services establishment offers more services involving specified sexual

activities and specified anatomical areas than services not so defined. Whether the City

was correct in determining that the Store would feature a preponderance of covered

services is arguable, but arguable as a matter of the sufficiency of the evidence before a

tribunal sitting to review state agency actions, not as a matter of constitutional law.

C.  Facial Challenges for Overbreadth

HH also challenges the Ordinance's definition of "adult services establishment" as

overbroad.

> The overbreadth doctrine prevents the government from
> casting a net so wide that its regulation impermissibly
> burdens speech. To avoid chilling the speech of third parties
> who may be unwilling or unlikely to raise a challenge in their
> own stead, the overbreadth doctrine in certain circumstances
> permits litigants already before the court to challenge a
> regulation on its face and raise the rights of third parties
> whose protected expression is prohibited or substantially
> burdened by the regulation. A facial overbreadth challenge is
> successful when it establishes "a realistic danger that the
> statute itself will significantly compromise recognized First
> Amendment protections of parties not before the Court." The
> Supreme Court has cautioned that overbreadth is "manifestly,
> strong medicine," and has invalidated regulations only when a
> limiting construction is not readily available and the
> unconstitutional applications of the regulation are real and
> substantial in relation to the regulation's plainly legitimate
> sweep.

*Schultz*, 228 F.3d at 848 (citations omitted).

HH contends that the definition of "adult services establishment" is substantially

overbroad in that "[a]ny establishment that sells a 'preponderance' of 'printed matter,

other forms of visual or audio representation, slides or similar photographic

reproductions' that are 'characterized by an emphasis upon the depiction or description of

specified anatomical areas for observation by patrons' would be ensnared as an 'Adult

Service[s] Establishment.'" Pl.'s Br. Supp., p. 21 (original alterations and ellipses

omitted) (quoting Code § 740-202(1) and (2)). HH then hypothecates a parade of third

parties whose expression, HH contends, would fall outside the Ordinance's plainly

legitimate sweep but would nevertheless come within its terms:

> [A] retail establishment dedicated to the promotion of
> breastfeeding, which displays written material depicting
> female breasts and sells t-shirts depicting female breasts
> along[side] slogans like 'eat local'; an artist's studio with a
> focus on phallic or vaginal art; a baker who creates and sells
> specialty cakes for events like bachelor and bachelorette
> parties; a newspaper that covers every[day] news, but
> includes advertisements at the back of each edition for phone
> sex hotlines; and a t-shirt distributor that displays and sells t-
> shirts depicting human anatomy in addition to other topics.

*Id.* at 21–22.

The problem with this argument is that it rests on a misunderstanding of the

definition it challenges. An adult services establishment "provides a preponderance of

services involving specified sexual activities or display of specified anatomical areas."

Code § 807-112. "Services involving specified sexual activities or display of specified

anatomical areas" is defined as "[a]ny combination of *two or more* of the following

[listed] activities[.]" *Id.* § 740-202 (emphasis added). One such activity is "the sale or

display" of audio, video, or print "characterized by an emphasis upon the depiction or

description of specified sexual activities or specified anatomical areas[.]" *Id.* § 740-

202(1). Another is the "presentation . . . for observation by patrons" of visual matter

"distinguished or characterized by an emphasis upon the depiction or description of specified sexual activities or specified anatomical areas[.]" *Id.* § 740-202(2).

Even assuming, generously, that the hypothetical third-party activities constitute a preponderance of the services offered by the third parties (e.g., that the baker sells a preponderance of specialty cakes), and assuming further that the hypothetical third-party activities each constitute a covered activity under the Ordinance, still none of the hypothetical third parties would come within the definition of "adult services establishments" by participating in only *one* covered activity, rather than a "combination of two or more" covered activities as required by the definition. *Id.* § 740-202.

The Ordinance is therefore unlikely to be substantially overbroad on the grounds advanced by HH.

## II. Equal Protection

HH challenges the City's determination as violative of the Equal Protection Clause and its protection against intentional invidious discriminatory treatment. *See Washington v. Davis*, 426 U.S. 229, 239 (1976). HH contends that, as "a general merchandise retailer [i.e., not an adult entertainment business,] [it] was treated differently from any other general merchandise retailers that have sought requisite permits from the City." Pl.'s Br. Supp., p. 23. A continuing equal protection violation causes irreparable injury. *Baskin*, 983 F. Supp. 2d at 1028 (collecting cases). We therefore turn to the merits of HH's claim.

HH does not allege itself to be a member of a protected class. It argues rather that, where a classification burdens fundamental rights, the classification receives strict scrutiny. Pl.'s Br. Supp., p. 22. This is correct as a general proposition, *FCC v. Beach*

*Commc'ns*, 508 U.S. 307, 313 (1993), but cannot be true of classifications restricting the time, place, or manner of protected First Amendment expression, which receive intermediate scrutiny. *BBL*, 809 F.3d at 325; *see generally Young*, 427 U.S. at 63–72 (permitting disparate treatment of adult businesses under the Equal Protection Clause without strict scrutiny). To this extent, HH's equal protection claim collapses into HH's "as applied" First Amendment claim. Absent a suspect class or a fundamental right, the state's treatment is reviewed for rationality only. *Beach Commc'ns*, 508 U.S. at 313; *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 547 (7th Cir. 2008).

HH essentially advances a class of one claim: that it alone was treated differently from similarly situated comparators, i.e., other "general merchandise retailers." Pl.'s Br. Supp., p. 23; *see Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (recognizing class-of-one claims); *Brunson v. Murray*, 843 F.3d 698, 705 (7th Cir. 2016). The problem with HH's argument is that its comparators are of no help, and state-law error does not rise to the level of constitutional arbitrariness and irrationality.

HH proposes Spencer Gifts and Victoria's Secret as "general merchandise retailer" comparators, Pl.'s Br. Supp., p. 23, but, as the City points out, the Spencer Gifts and Victoria's Secret in area near the Premises are located in a C-4, not a C-3, zoning district. Defs.' Br. Opp., p. 14. Thus HH's comparators have not been treated differently in this geographic respect. To the extent that HH complains that those retailers, while selling the same product mix and engaged in the same line of business as HH, have not been classified as adult entertainment businesses, HH clearly cannot contend that the City

discriminates against retailers offering that same product mix, and HH again simply complains that the City's determination was erroneous.

A plaintiff operating in a restricted universe of potential comparators may dispense with the need for comparators by bootstrapping a campaign of arbitrary and irrational treatment into its own evidence of discriminatory intent, *see Brunson*, 843 F.3d at 707, but no such restricted universe is present here, where every person and entity wishing to use land in Marion County is subject to Marion County land-use regulation under the Ordinance.

Finally, HH cannot show constitutionally arbitrary or irrational treatment. There must be "no rational basis" for the difference in treatment. *Olech*, 528 U.S. at 564. "[T]he classic example of irrational government action in a class of one equal protection case in this circuit is an ordinance saying: 'No one whose last name begins with "F" may use a portable sign in front of a 24–hour food shop, but everyone else may.'" *Flying J*, 549 F.3d at 547 (quotations and citation omitted). A merely erroneous application of state law cannot be characterized this way, and neither can the City's reliance on public safety and, allegedly, public morality, even if those reasons would not withstand constitutional scrutiny under a pure First Amendment analysis.

Absent similarly situated comparators and arbitrary or irrational treatment, it is unlikely HH will succeed on the merits of its equal protection claim.

## III. Arbitrary, Capricious, and Unsupported by Substantial Evidence

Finally, HH claims that the City's determination was reversibly erroneous as arbitrary, capricious, and unsupported by substantial evidence under Indiana's

Administrative Orders and Procedures Act. Ind. Code § 4-21.5-5-14; *Breitweiser v. Ind. Office of Envtl. Adjud.*, 810 N.E.2d 699, 702 (Ind. 2004).

On these grounds, however, HH has not alleged any irreparable injury. It correctly notes the strong presumption of legal remedial inadequacy for the loss of First Amendment rights, Pl.'s Br. Supp., p. 28, but has not undertaken any showing that, absent a constitutional violation, the harm occasioned by the City's arbitrary, capricious, or unsupported administrative decision is not compensable by money damages. We must therefore deny HH's motion on these grounds.

## Conclusion

None of HH's constitutional claims have a better than negligible chance of success on the merits, and the state-law claim does not allege irreparable injury. For these reasons, as explained more fully above, HH's motion for a preliminary injunction is DENIED.

IT IS SO ORDERED:


Date:   9/22/2017

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Erin Elizabeth McCampbell
LIPSITZ GREEN SCIME CAMBRIA LLP
emccampbell@lglaw.com

Paul J. Cambria, Jr.
LIPSITZ GREEN SCIME CAMBRIA, LLP
pcambria@lglaw.com

Thomas J.O. Moore
OFFICE OF CORPORATION COUNSEL
thomas.moore@indy.gov

Nabeela Virjee
OFFICE OF CORPORATION COUNSEL
nabeela.virjee@indy.gov

Jeffrey Martin Bellamy
THRASHER BUSCHMAN GRIFFITH & VOELKEL
bellamy@indiana-attorneys.com